Slip Op. 11-72

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GLOBE METALLURGICAL INC., | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | Consol. Court No. 10-00032 |
| Defendant. | |

### OPINION and ORDER

[Administrative review results remanded.]

Dated: June 21, 2011

DLA Piper LLP (US) (William D. Kramer, Martin Schaefermeier, Arlette Grabczynska) for Plaintiff Globe Metallurgical Inc.

Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (L. Misha Preheim, Stephen C. Tosini); and Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (Aaron P. Kleiner), of counsel, for Defendant United States.

Mayer Brown LLP (Sydney H. Mintzer, Duane W. Layton, Jeffrey C. Lowe) for Defendant-Intervenors Shanghai Jinneng International Trade Co., Ltd. and Jiangxi Gangyuan Silicon Industry Co., Ltd.

Gordon, Judge: This consolidated action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering Silicon Metal from the People's Republic of China. See Silicon Metal from China, 75 Fed. Reg. 1,592 (Dep't of Commerce Jan. 12, 2010) (final results admin. review) ("Final Results"); see also Issues and Decision Memorandum for Silicon Metal from People's Republic of China, A-570-806 (Jan. 5, 2010), available at

http://ia.ita.doc.gov/frn/summary/PRC/2010-378-1.pdf (last visited June 21, 2011) ("Decision Memorandum"). Before the court are motions for judgment on the agency record filed by Globe Metallurgical Inc. ("Globe"), and Shanghai Jinneng International Trade Co., Ltd. ("Shanghai") and Jiangxi Gangyuan Silicon Industry Company, Ltd. ("Jiangxi") (collectively "Respondents"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006).

Globe challenges (1) Commerce's decision not to reduce Respondents' export prices by the amount of an export tax and value added tax; (2) Commerce's selection of the average value for Grade A non-coking coal published in the Indian Bureau of Mines Yearbook as the surrogate value for Respondents' coal input; and (3) Commerce's reliance upon all sales invoiced by Respondents during the period of review ("POR"), rather than all sales entered during the POR.

Respondents challenge Commerce's decision to include FACOR in its SG&A calculations despite Respondents' contention that FACOR is a "sick" company under Indian law. Alternatively, Respondents challenge the exclusion of the following line-items in FACOR's financial statements from the SG&A expense ratio calculation: (1) the sale of a surplus captive power plant (a fixed asset) and (2) miscellaneous income.

For the reasons set forth below, the court remands this action to Commerce to address Respondents' challenge to Commerce's treatment of FACOR's SG&A expense

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

ratio calculation.   The court sustains Commerce's determinations regarding all other issues in this action.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains determinations, findings, or conclusions of the U.S. Department of Commerce unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).   More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.   Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).   Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Dupont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).   Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."   Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).   Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.   3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2011).   Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."

Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2010).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. Dupont, 407 F.3d 1211, 1215; Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1030 (Fed. Cir. 2007). "[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron." Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001); see also Wheatland Tube Co. v. United States, 495 F.3d 1355, 1359 (Fed. Cir. 2007) ("[W]e determine whether Commerce's statutory interpretation is entitled to deference pursuant to Chevron.").

## II. Discussion

### A. Export Tax and VAT

During the administrative review Respondents provided information regarding a Chinese export tax and a value added tax ("VAT") on subject merchandise. Respondents reported that their sales of subject merchandise after January 1, 2008 were subject to a 10% export tax.  See Jiangxi's Sec. C Questionnaire Response, PD 35 at frm. 16 (Nov. 17, 2008)[2]; Shanghai's Sec. C Questionnaire Response, PD 36 at frm. 18 (Nov. 17, 2008).  Respondents reported that their respective export sales were also subject to a VAT, in addition to the export tax.  See Jiangxi's Supp. Secs. C-D

---

[2] "PD __" refers to a document contained in the public administrative record. "CD __" refers to a document contained in the confidential administrative record.

Questionnaire Response, CD 24 at frms. 11, 35-41 (Feb. 23, 2009); Shanghai's Supp.

Secs. C-D Questionnaire Response, CD 28 at frms. 11-12, 19-30 (Mar. 11, 2009).

Commerce published the preliminary results, reducing Respondents' export prices by 10 percent based upon the export tax, pursuant to 19 U.S.C. § 1677a(c)(2)(B). See 74 Fed. Reg. 32,885, 32,887 (July 9, 2009) ("Preliminary Results"). Commerce did not reduce Respondents' export prices based upon the VAT, stating that it had not previously considered whether a VAT applied to export sales would be covered by subsection 1677a(c)(2)(B) and invited parties to comment upon the issue for the final results. Id.; see also Letter to Interested Parties Requesting Comments Upon Treatment of Chinese Value Added Taxes on Export Sales, PD 129 (June 29, 2009).

Respondents argued in their administrative case brief that Commerce's preliminary determination to reduce their export prices based upon the export tax was correct, but that Commerce should not further reduce their export prices based upon the VAT. See Respondents' Admin. Case Br., PD 156 at frms. 14-21 (Aug. 21, 2009). In its case brief Globe also argued that Commerce's preliminary determination to reduce Respondents' export prices based upon the export tax was correct, and Globe further claimed that Respondents' export prices should be reduced based upon the VAT. See Globe's Admin. Case Br., PD 155 at frms. 12-21 (Aug. 21, 2009).

Commerce subsequently placed three documents upon the record for comment by the parties. Two of the documents were letters from Chinese Government officials to the U.S. Secretary of Commerce regarding Commerce's treatment of the export tax and VAT. These letters stated that Commerce's preliminary determination with respect to

the export tax was inconsistent with Commerce's administrative practice, as upheld by the U.S. Court of Appeals for the Federal Circuit in <u>Magnesium Corp. v. United States</u>, 166 F.3d 1364, 1370-71 (Fed. Cir. 1999), and that any reduction to Respondents' export prices based upon the VAT would also run counter to this practice.   <u>See</u> Letter to Interested Parties Requesting Comments Upon Letters from Ms. Zhou Wenzhong, Ambassador Extraordinary and Plenipotentiary of the People's Republic of China to the United States, and Madame Zhou Xiaoyan, Director General of the Bureau of Fair Trade for Imports and Exports, Ministry of Commerce of the People's Republic of China, PD 170 at frms. 1-8 (Nov. 9, 2009).   Commerce also placed its voluntary remand redetermination in the <u>Magnesium Corp.</u> litigation upon the record.   <u>Id.</u> at 9-26. Because Commerce placed these documents upon the record subsequent to the administrative briefing period, Commerce requested that parties comment upon the letters and remand redetermination.

Commerce received comments from Globe, Respondents, and the Chinese Ministry of Commerce.  Respondents and the Chinese Ministry of Commerce argued that Commerce should reverse its preliminary determination with respect to the export tax and should not reduce Respondents' export prices for the VAT, while Globe maintained that Commerce should maintain its preliminary determination with respect to the export tax and apply the same approach to the VAT.  <u>See</u> Globe's Comments, PD 176 (Dec. 3, 2009); Respondents' Comments Upon Deduction of Export Taxes and VAT from Export Price, PD 177 (Dec. 3, 2009); Chinese Ministry of Commerce's Comments Upon Deduction of Export Tax and VAT From Export Price, PD 175 (Dec. 2, 2009).

Commerce then placed upon the record a letter from a third Chinese Government official to the Secretary of Commerce regarding Commerce's treatment of the export tax and VAT. The letter argued that Commerce should reverse its preliminary determination with respect to the export tax and should not reduce Respondents' export prices based upon the VAT. See Letter to Interested Parties Requesting Comments Upon Letter from Mr. Chen Deming, Minister of Commerce of the People's Republic of China, PD 178 (Dec. 11, 2009). On December 16, 2009, Globe provided comments in opposition to the Chinese Government's approach. See Globe's Comments, PD 179 (Dec. 16, 2009).

In the Final Results Commerce relied on Magnesium Corp. and Commerce's longstanding administrative practice in deciding not to reduce Respondents' export prices by the export tax or VAT. Decision Memorandum at 13-20, PD 184 at frms. 13-20. Commerce explained that "the salient issue in the instant case is the same issue that was before the Federal Circuit in Magnesium Corp.: whether respondents' U.S. prices reflect a NME export tax such that the export tax is 'included in such price' within the meaning of subsection 1677a(c)(2)(B)." Id. at 15 (citing Magnesium Corp., 166 F.3d at 1370-71).

Globe challenges this decision, arguing that the statute mandates that Commerce reduce export price by the export tax and VAT in a non-market economy ("NME") case. The Federal Circuit in Magnesium Corp., however, held otherwise. Magnesium Corp. addressed Commerce's final determinations in the antidumping investigations of pure magnesium and magnesium alloy from the Russian Federation,

an NME.  As in this case, the Russian respondents reported that they paid an export tax

and similar administrative fees on subject merchandise.  Commerce reasoned that "the

export tax paid to an NME government is an intra-NME transfer of funds between a

Russian producer and the Russian government.  As such, it is inappropriate to account

for such transfers in our [less than fair value] analysis just as it is NME prices and

costs."  See Pure Magnesium & Alloy Magnesium from the Russian Federation, 60 Fed.

Reg. 16,440, 16,448 (Dep't of Commerce Mar. 30, 1995) (final determ. of sales at less

than fair value).   Accordingly, Commerce did not reduce the Magnesium Corp.

respondents' export prices.

The Magnesium Corp. petitioners challenged Commerce's determination before

the U.S. Court of International Trade.   Commerce, in turn, requested a voluntary

remand to further explain its determination not to implement subsection 1677a(c)(2)(B)

in the underlying investigations.  See Magnesium Corp. v. United States, 20 CIT 1092,

1113-14, 938 F. Supp. 885, 905-06 (1996).  On remand Commerce reasoned that the

nature of NMEs precluded Commerce from valuing the Russian Federation's export

taxes and fees as a component of the respondents' prices.  Commerce explained:

> [I]n a market economy country, a producer subject to a government-
> imposed export tax can be expected to actually incur the tax liability and to
> incorporate the tax amount into its cost and pricing structure. . . . No such
> presumption can be made, however, in the context of a [NME].   The
> [NME] is governed by a presumption of widespread intervention and
> influence in the economic activities of enterprises.  An export tax charged
> for one purpose may be offset by government transfers provided for
> another purpose.  In such circumstances, [Commerce] has no basis for
> determining whether and to what extent a tax might be reflected in a price.
> This is the very type of internal NME transfer that the statute directs the
> Department to reject.

<u>See</u> Remand Redetermination, PD 170 at frm. 15.   The Court of International Trade

upheld Commerce's remand, deferring to Commerce's analysis of subsection

1677a(c)(2)(B) under <u>Chevron</u> Step 2.   <u>See</u> <u>Magnesium Corp. v. United States</u>, 20 CIT

1464, 1466, 949 F. Supp. 870, 872 (1996).

The petitioners appealed to the Federal Circuit, which sustained Commerce's

determination, albeit under <u>Chevron</u> Step 1.   The Federal Circuit concluded that

subsection 1677a(c)(2)(B) expressly contemplates that export taxes will not be included

in all export prices, given that the statute requires Commerce to reduce the export price

only when the export tax is "included in such price."   <u>Magnesium Corp.</u>, 166 F.3d at

1370.   The court further held that Commerce's approach properly recognized the

statutory distinction between market economies and NMEs with respect to valuation of

internal costs and prices.   <u>Id.</u>   The court distinguished between market and NME

economies with respect to application of subsection 1677a(c)(2)(B):

> In a market economy, Commerce can presume that any tax imposed on the merchandise to be exported will be included in the [United States price] of that merchandise.  However, that presumption is not available when the merchandise is produced in a non-market economy.  By definition, in a [NME], the price of merchandise does not reflect its fair value because the market does not operate on market principles. Therefore, <u>no reliable way exists to determine whether or not an export tax has been included in the price of a product from a [NME]</u>.

<u>Id.</u> (internal citation omitted; emphasis added).   Accordingly, the Federal Circuit held

that Commerce's interpretation harmonized subsection 1677a(c)(2)(B) with the statutory

definition of an NME, and that Commerce's approach gave meaning to the phrase,

"included in such price."   <u>Id.</u> at 1371.

In attempting to distinguish the facts of <u>Magnesium Corp.</u>, Globe argues that the export tax and VAT in this case were not internal-NME transfers because, according to Globe, Respondents included both taxes in their export prices. Rev. Br. in Supp. of Globe's Mot. for J. upon Agency R. at 4-7, 10-11, ECF No. 42 ("Globe's Br."). The administrative record, however, does not support Globe's argument that the export tax and VAT are not internal NME transfers. The record indicates that the export tax is paid by the exporter to Chinese Customs authorities in remimbi ("RMB") upon exportation of the merchandise, not by the U.S. purchaser. Shanghai Jinneng's Supp. Sec. C Questionnaire Response, CD 28 at Ex. SC-3 (Mar. 11, 2009). Similarly, the VAT is paid in RMB on an aggregated basis by Respondents to the Chinese authorities. <u>Id</u>. Also, contrary to Globe's claim, the record indicates that Chinese law does not require the VAT to be charged to customers on export sales. <u>See</u> Respondent's 2007/2008 Admin. Review Rebuttal Brief, CD 69 (Sept. 9, 2009). Defendant adds that even if an NME respondent asserts that its export prices incorporate a tax payment, such tax payments would still be intra-NME transfers that cannot be properly valued. Def.'s Resp. to Pl.'s and Def.-Ints.' Mots. for J. upon the Agency R. at 17 (citing <u>Magnesium Corp.</u>), ECF No. 49 ("Def.'s Br.").

Focusing upon Respondents' statements that their export prices are based upon the "world market price" for silicon metal, Globe argues that the Respondents' operations within an NME is irrelevant to Commerce's application of subsection 1677a(c)(2)(B). Globe's Br. at 12. Globe's argument mistakenly implies that Respondents' prices reflect market conditions. Commerce's determination as to whether merchandise is priced according to market conditions is based upon the nature

of the exporting country, not the destination country.  See Decision Memorandum at 16-17 (citing Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1445-46 (Fed. Cir. 1994)).  Commerce explained that equating Respondents' export prices with market economy prices "would suggest that NME export prices are determined by market conditions.  The Department declines to adopt this fundamental change to its NME methodology."  Id.

Globe further argues that Commerce's determination not to reduce Respondents' export prices runs counter to Congressional intent with respect to subsection 1677a(c)(2)(B).  Globe's Br. at 14-16.  The legislative history cited by Globe, however, is silent with respect to the issue presented by this case—the application of subsection 1677a(c)(2)(B) within NME proceedings.  See id. (citing H. Rep. No. 93-571 at 69 (1973), S. Rep. No. 93-1298, at 172 (1974)).  In addressing this issue the Federal Circuit explained that Commerce's practice "both harmonizes subsection [1677a(c)(2)(B)] (deduction of export taxes) with subsection 1677(18) (definition of non-market economy), and gives meaning to every part of subsection [1677a(c)(2)(B)], including the clause 'if included in such price.'"  Magnesium Corp., 166 F.3d at 1371.

Globe also claims that Commerce's determination not to reduce Respondents' export prices by the amount of the Chinese taxes violates Commerce's statutory obligation to calculate tax-neutral dumping margins.  Globe's Br. at 16-17.  According to Globe, because Commerce prefers tax-exclusive surrogate values in determining the normal value of subject merchandise, Commerce's determination not to reduce Respondents' export prices for the Chinese taxes runs counter to administrative and

judicial precedent to calculate accurate, tax-neutral dumping margins.  Id.  Globe's "tax neutrality" argument, however, relies exclusively on cases that dealt with administrative reviews of market economy antidumping duty orders, and thus fails to address subsection 1677a(c)(2)(B) in the NME context.  See Parkdale Int'l v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007) (addressing Commerce's reseller policy in market economy administrative review); Micron Techs., Inc. v. United States, 243 F.3d 1301, 1313 (Fed. Cir. 2001) (addressing application of 19 U.S.C. § 1677a(d)(1)(D) in market economy case); Viraj Forgings, Ltd. v. United States, 27 CIT 1472, 1477, 283 F. Supp. 2d 1335, 1340 (2003) (regarding application of 19 U.S.C. § 1677b(a)(1)(C) in market economy administrative review); Certain Corrosion-Resistant Carbon Steel Flat Products From Korea, 61 Fed. Reg. 18,547, 18,548 (Dep't of Commerce Apr. 26, 1996) (final results of admin. review).

In sum, Globe's arguments challenging Commerce's treatment of Respondent's export taxes and VAT are unpersuasive.  These issues were long ago addressed and resolved by the Federal Circuit in Magnesium Corp., a decision that is binding here. The court therefore must sustain Commerce's decision on these issues.

### B. Respondents' Coal Input

When valuing the factors of production in an NME proceeding, Commerce must use the "best available information" when selecting surrogate data from "one or more" surrogate market economy countries. 19 U.S.C. § 1677b(c)(1), (4).  Commerce's regulations provide that surrogate values should "normally" be publicly available and (other than labor costs) from a single surrogate country. 19 C.F.R. § 351.408(c) (2009).

When making its surrogate value selections (and when comparing and contrasting various data sets), Commerce considers "the quality, specificity, and contemporaneity of the available values." Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 73 Fed. Reg. 52,015, 52,020 (Dep't of Commerce Sept. 8, 2008) (prelim. results admin. review).   Commerce prefers data that reflects a broad market average, is publicly available, contemporaneous with the period of review, specific to the input in question, and exclusive of taxes on exports. Certain Pneumatic Off-the-Road Tires from the People's Republic of China, 73 Fed. Reg. 40,485 (Dep't of Commerce July 15, 2008) and accompanying Issues and Decision Memorandum, A-570-912 (July 7, 2008), cmt. 10 at 26, available at http:// ia.ita.doc.gov/frn/ summary/PRC/E8-16156-1.pdf (last visited June 21, 2011).

When reviewing substantial evidence issues involving Commerce's selection of the best available surrogate values, the court evaluates "whether a reasonable mind could conclude that Commerce chose the best available information."   Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d, 1323, 1327 (2006); see also CITIC Trading Co. v. United States, 27 CIT 356, 366 (2003) ("[W]hile the standard of review precludes the court from determining whether [Commerce's] choice of surrogate values was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices.").

For the surrogate values for Respondents' inputs and expenses, Commerce selected India as the surrogate country. <u>Preliminary Results</u>, 74 Fed. Reg. at 32,887-88. During the administrative review Commerce asked for, and Respondents reported, the technical specifications of the coal input used in the production of subject merchandise. <u>See</u> Jiangxi's Supp. Secs. C-D Questionnaire Response, CD 24 at frms. 49-50, 157 (Feb. 23, 2009); Shanghai's Supp. Secs. C-D Questionnaire Response, CD 28 at frms. 141, 176, 179-180 (Mar. 11, 2009).   Jiangxi reported its coal specifications, which included, in part: moisture content; ash content; volatile matter content; and caking index.   <u>See</u> Jiangxi's Supp. Secs. C-D Questionnaire Response, CD 26 (Feb. 23, 2009). Shanghai's affiliated producer, Datong, reported that its coal had the following specifications, in part: moisture content and ash.   <u>See</u> Datong's Supp. Secs. C-D Questionnaire Response, CD 28 at frm. 176 (Mar. 11, 2009).   Additionally, Datong provided a sample invoice for its purchases of coal, which listed its ash and moisture content requirements and also specified caking index requirements.  <u>Id</u>. at frm. 179.

To value Respondents' coal input, Commerce relied upon the average value for Grade A non-coking coal provided by the Indian Bureau of Mines Yearbook for 2007 ("IBM Yearbook").   <u>See</u> Selection of Factor Values Memo., PD 131 at frms. 4, 66-97 (June 29, 2009).   Commerce noted that the Indian coal system uses an empirical formula to identify commercial-grade non-coking coal.   <u>See</u> Prelim. Surrogate Value Memo., PD 131 at frm. 4 (citing Globe's Rebuttal Surrogate Value Submission, PD 92 at frms. 17-18).   Specifically, the Indian coal classification system identifies commercial Grade A non-coking coal as having a Useful Heat Value ("UHV") in excess of 6200,

pursuant to the following formula:   UHV = 8900 - 138 (A + M), where A is ash percentage and M is moisture percentage.   <u>See</u> Respondents' Surrogate Value Submission, PD 87 (Apr. 3, 2009).   After deriving the UHV for Respondents' coal input using Respondents' ash and moisture content specifications, Commerce determined that the appropriate surrogate value was the average value for Grade A non-coking coal provided in the IBM Yearbook.   <u>See</u> <u>Decision Memorandum</u> at 43 (citing Respondents' Surrogate Value Submission, PD 87 at frm. 429 (Apr. 3, 2009)).

Globe argues that Commerce erred in its surrogate value selection for Respondents' coal input, insisting that Commerce's decision not to use the Chinese coal classification system to first determine whether Respondents' coal input was "coking" or "non-coking" coal caused Commerce to select an erroneous surrogate value. Globe's Br. at 20-21.   Defendant counters that it "is inherent in the process of identifying many surrogate values that Commerce must rely on the surrogate country's product classification systems." Def.'s Br. at 24.

In this case Commerce used Respondents' coal specifications and tied them to a surrogate data source using an empirical formula.   To the extent that Commerce classified Respondents' coal inputs using surrogate data, it did so in the same manner that it would in any other NME proceeding—it matched the technical specifications of Respondents' inputs with an appropriate surrogate data source.   This approach is reasonable on this administrative record given the differences between the Chinese and Indian coal classifications systems.   According to the information on the administrative record, India apparently has two classes of coal, coking and non-coking, with many grades

within each class, while China appears to have 11 classes of coal with no grades. Compare Respondent's Surrogate Value Submission, PD 87 at frm. 429 (Apr. 3, 2009) (2007 IBM Yearbook at 24-24) with Plaintiff's Rebuttal Surrogate Value Submission, PD 92 at frm. 52 (Apr. 13, 2009) (Chinese GB5751-86 Standard Classification).

Commerce had no reason to rely upon the Chinese coal classification system because Respondents' detailed coal specifications allowed Commerce to accurately select a surrogate value from India.  Commerce explained that because ash and moisture content provide a sufficient basis to identify the appropriate surrogate value in India, Commerce did not need to consider how various other technical specifications (such as volatile matter content) are treated under other countries' coal classification systems to identify an appropriate surrogate.  This determination was both sensible and reasonable and satisfies the requirement of Hebei Metals & Minerals Import & Export Corp. v. United States, 29 CIT 288, 295, 366 F. Supp. 2d 1264, 1270 (2005) that Commerce determine the type of coal used by Respondents and select an appropriate surrogate value.  Commerce relied upon Respondents' particular coal specifications and an empirical classification formula to identify the appropriate surrogate value for coal.

Globe also argues that the record demonstrates that Respondents' coal could only have been coking coal.  Globe's Br. at 25.  Defendant responds that Globe relies exclusively upon a vague definition of coking coal that lacks the empirical rigor of Commerce's approach.  Defendant explains that Globe cites a definition for primary coking coal that characterizes it as coal with "high coking properties and low volatile matter content," and then Globe asserts that Respondents' coal must be coking coal

because of its caking index and volatile matter content.  Globe's Br. at 26.  Defendant points out that Globe fails to provide any benchmark for the "relative" properties of coking versus non-coking coals under the Indian system.    Globe's analysis is unreasonably vague and imprecise when compared with Commerce's reliance upon what appears to be a more robust empirical formula.    Accordingly, Globe does not provide a basis for the court to conclude that Commerce's determination is unreasonable.

Globe also argues that it is impossible to identify the type of Indian coal used by Respondents based on ash and moisture content because the ash and moisture content of coking and non-coking coal overlap.  Globe's Br. at 24.  Globe concludes that Respondent's coal would be graded as either Steel Grade I coking coal or Grade A non-coking coal, depending on whether it is coking coal or non-coking coal.  Id. at 24-25. Respondents explain that Globe's conclusions are factually incorrect.    As an initial matter, the IBM Yearbook does not assign a moisture content for Steel I Grade coking coal.    See Respondent's Surrogate Value Submission, PD 87 at frm. 430 (IBM Yearbook at 24-25).  The IBM Yearbook indicates that Steel Grade I coking coal has an ash content "exceeding 15% but not exceeding 18%," while Grade A non-coking coal has a combined ash and moisture content of 19% or less.  Id.  Respondents' coal has much lower ash levels than that of Steel Grade I coking coal.  See Jiangxi Gangyuan's Supp. Sec. D Questionnaire Response, CD 24 (Feb. 23, 2009); Jiangxi Gangyuan's Supp. Sec. C-D Questionnaire Response, CD 41 (Apr. 21, 2009); Datong Jinneng' s Supp. Sec. D Questionnaire Response, CD 28 (Mar. 11, 2009).    Therefore,

Respondents' coal ash content is well below the floor set by the Indian Steel Grade I coking coal standard.  Further, the combined ash and moisture content of Respondents' coal fall under 19%, like Grade A non-coking coal. Id.  There is, therefore, ample record evidence demonstrating that Grade A non-coking matched Respondents' coal specifications.

Finally, Globe argues that Respondents' coal could not have been non-coking coal because only coking coal could withstand metallurgical applications such as silicon metal production.  Globe's Br. at 26.  If this were true, one wonders why Globe would bother with all its other arguments on this issue.  Here again, Commerce determined that the record did not support Globe's claim.  Commerce explained that the Coal Directory of India (a publication of the Indian Ministry of Coal that Globe placed upon the record), stated that non-coking coal with low ash content and higher fixed carbon relative to coking coal can be used in metallurgical applications.  Globe's Rebuttal Surrogate Value Submission, PD 92 at frm. 34 (Apr. 13, 2009).

In short, Globe's arguments about the unreasonableness of Commerce's coal input surrogate value selection are unpersuasive.  Commerce's choice was reasonable given the administrative record, and therefore must be sustained.

### C. Respondents' Sales Database

During the administrative review Respondents submitted their United States sales databases, which identified the date that the United States customer was invoiced (the "invoice date"), the date that payment was received (the "payment date"), and the date that the merchandise was shipped (the "shipment date").  See Jiangxi's Sec. C

Questionnaire Response, CD 10 at frms. 31-34 (Nov. 17, 2008); Shanghai's Second

Supp. Secs. C-D Questionnaire Response, CD 40 at frms. 20-23 (Mar. 11, 2009).  The

databases did not identify the date that the sales entered the United States (the "entry

date").

      In May 2009, Commerce conducted verification of Datong's production data,

Shanghai's United States sales data, and Jiangxi's production and United States sales

data.  See Verification Report for Datong, CD 62 (June 30, 2009); Verification Report for

Shanghai, CD 57 (June 29, 2009); Verification Report for Jiangxi, CD 58 (June 29,

2009).   In calculating Respondents' preliminary dumping margins, pursuant to

Respondents' designation of the invoice date as the date of sale for their United States

sales, Commerce relied upon all sales invoiced during the POR in its price

comparisons.  See Jiangxi's Sec. C Questionnaire Response, CD 10 at frm. 10 (Nov.

17, 2008) ("The date of invoice is the date of sale."); Shanghai's Sec. C Questionnaire

Response, CD 11 at frm. 11 (Nov. 17, 2008) ("The date of invoice is the date of sale.");

see also Preliminary Analysis Memo. for Jiangxi, CD 55 at frm. 13 (June 29, 2009)

(using the sales invoice date ("SALINDTU") to identify sales within the POR);

Preliminary Analysis Memo. for Shanghai, CD 56 at frm. 13 (June 29, 2009)

(SALINDTU to identify sales within the POR).

      In the Final Results Commerce calculated Respondents' dumping margins based

upon all sales invoiced during the POR.   Decision Memorandum at 49-51; see also

Final Analysis Memo. for Jiangxi, CD 74 at frm. 9 (Jan. 5, 2010) (using SALINDTU to

identify sales within the POR); Final Analysis Memo. for Shanghai, CD 73 at frm. 12

(Jan. 5, 2010) (using SALINDTU to identify sales within the POR).   In response to

Globe's claim that this determination was inconsistent with Commerce's normal practice

of using only sales that entered during the POR, Commerce stated that it would deviate

from its normal practice for two reasons.   First, Commerce reasoned that it had relied

upon all sales invoiced during the period of review for the 2005-06 new shipper reviews

of Respondents, thus it had to adopt the same approach in this case to avoid missing

transactions from review-to-review.   See Decision Memorandum at 50.   Second,

Commerce determined that it could not filter Respondents' United States sales

databases to exclude sales that may have entered after the POR because Respondents

had not provided the entry dates for their United States sales.   Id.

Subsection 1675(a)(2)(A) of the antidumping statute provides that Commerce

calculate dumping margins for each entry during the period of review.   See 19 U.S.C. §

1675(a)(2)(A).   In interpreting this provision, Commerce has explained that, under 19

U.S.C. § 1677a and 19 U.S.C. § 1677b, Commerce is to evaluate sales in determining

the appropriate export price (or constructed export price) and normal value, "without

recognizing that [entries and sales] are not synonymous or providing a mechanism for

linking them."   See Advance Notice of Proposed Rulemaking, 56 Fed. Reg. 63,696

(Dep't of Commerce Dec. 5, 1991).   Given this ambiguity, Commerce determined that

Congress intended that Commerce must examine all transactions during the POR.

Specifically, Commerce explained that, "by referring to 'entry' the drafters . . . likely

intended that in a review, unlike an investigation, [Commerce] would examine every

transaction; they did not mean necessarily that Commerce would have to tie 'entries' to

'sales' in ordering assessment." Id.  Accordingly, Commerce's regulations provide that an administrative review "will cover, as appropriate, entries, exports, or sales." See 19 C.F.R. § 351.213(e)(1)(ii).

In this review both Respondents made "export price" or "EP" sales, meaning that their sales to the United States were made to one or more unaffiliated purchasers. See 19 U.S.C. § 1677a(a).   Normally, in administrative reviews involving EP sales, Commerce calculates dumping margins based upon sales that entered the United States during the POR.  See, e.g., Certain Frozen Warmwater Shrimp from Ecuador, 73 Fed. Reg. 39,945 (Dep't of Commerce July 11, 2008), and accompanying Issues and Decision     Memorandum     at     cmt.     4,     available     at http://www.ia.ita.doc.gov/frn/summary/ECUADOR/E8-15830-1.pdf (last visited June 21, 2011).  However, in this case, Commerce departed from its normal practice for two reasons.  First, Commerce explained that, in the 2005–06 new shipper reviews for Respondents, it calculated dumping margins using all transactions with a date of sale during the POR.  See Decision Memorandum at 50.  Given that Respondents had designated the invoice date as the date of sale and all sales were invoiced during the POR, Commerce found that it must rely upon all sales invoiced during this review to prevent it from missing transactions from review to review.  Id.  "In order to comprehensively examine the universe of any respondent's transactions, the Department must apply a consistent methodology across segments in order to avoid potentially overlooking transactions." Id.

Second, Commerce explained that Respondents had not provided the entry dates for their United States sales.  Id.  Specifically, Respondents' United States sales databases identified the invoice date, payment date, and shipment date for the United States customer.  The databases did not identify the entry date for the United States sales.  See Jiangxi's Sec. C Questionnaire Response, CD 10 at frms. 31-34 (Nov. 17, 2008); Shanghai's Second Supp. Secs. C-D Questionnaire Response, CD 40 at frms. 20-23 (Mar. 11, 2009).  Commerce reasoned that Respondents' inability to provide the entry dates for their sales distinguished this case from other reviews involving EP sales in which the respondents provided Commerce with the entry dates of their sales.  See Decision Memorandum at 50-51 (citing, e.g., Certain Frozen Warmwater Shrimp From Thailand, 73 Fed. Reg. 50,933 (Dep't of Commerce Aug. 9, 2008) (final results of admin. review), and accompanying Issues and Decision Memorandum at cmt. 4, available at http://www.ia.ita.doc.gov/frn/summary/THAILAND/E8-20165-1.pdf (last visited June 21, 2011)).

Globe challenges both of Commerce's stated reasons for its departure from its normal practice.  First, with respect to Commerce's determination that its reliance upon Respondents' sales invoiced during the POR is consistent with its methodology in the 2005-06 new shipper reviews of Respondents, Globe claims that Commerce's determination  is inconsistent with those  reviews.  Globe fails, however, to demonstrate any inconsistency between the two reviews. As Commerce correctly explained, in both the new shipper reviews and in this case, Commerce relied upon the date of sale

reported by Respondent (invoice date) in determining which sales to utilize in the dumping margin calculations.  See id. at 50.

Next, with respect to Commerce's finding that the record does not provide an evidentiary basis to filter Respondents' United States sales database to exclude sales entered after the POR, Globe argues that both Respondents provided Commerce with entry information for their sales.  Defendant concedes that Commerce erred, in part, in its statement that "[t]he instant record does not provide the specific entry dates of Respondents' transactions."  See id. at 50.  Specifically, this statement was in error with respect to Jiangxi, which provided a spreadsheet that identifies the entry date of its shipments.  See Jiangxi's Supp. Sec. C-D Questionnaire Response, CD 24 at frm. 3 (Feb. 23, 2009).  This error, however, has no material effect on the Final Results because all of Jiangxi's sales entered the United States during the POR.

Additionally, Commerce's statement that the record lacks the entry dates for Respondents' transactions remains true with respect to Shanghai.  Although Globe suggests that Shanghai reported its entry dates, the evidence cited by Globe does not contain the entry dates.  Globe's Br. at 27 (citing Shanghai's Sec. C Questionnaire Response, PD 35 at frms. 8, 29 (Nov. 18, 2008)).  Thus, Globe's claim that the record contains Shanghai's entry dates is unsupported.

In addition to the above claims, Globe raises a new argument before the court that it did not present to Commerce.  Globe argues that Commerce should have used the U.S. Customs and Border Protection ("CBP") data showing Respondents' entries as a filter against Respondents' United States sales databases, thereby identifying which

sales entered during the POR.   Globe's Br. at. 29, Ex. 3-4.   However, Globe never raised this claim before Commerce, nor did Globe present the evidentiary analysis contained in its supporting exhibits.   Commerce's regulations require parties to raise all relevant arguments during the administrative briefing, 19 C.F.R. § 351.309, but Globe's administrative case and rebuttal briefs contain no mention of the CBP data as a basis to filter Respondents' United States sales databases, despite the issue of those databases being squarely in play.

When reviewing Commerce's antidumping determinations, the U.S. Court of International Trade requires litigants to exhaust administrative remedies "where appropriate." 28 U.S.C. § 2637(d).   "This form of non-jurisdictional exhaustion is generally appropriate in the antidumping context because it allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review—advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency." Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 89 (2006)). By failing to raise their arguments about the CBP data at the administrative level, Globe deprived Commerce of the opportunity to address that data and "apply its expertise," potentially "rectify administrative mistakes," or "compile a record adequate for judicial review." Id.   Therefore, the court will not consider Globe's new arguments regarding Respondents' sales database. Instead, the court will sustain Commerce's determination to calculate Respondents' dumping margins using all sales invoiced during the POR.

### D. FACOR: Indian Sick Industrial Companies Act

To value Respondents' factory overhead, profit, and selling, general, and administrative expenses ("SG&A") for the preliminary results, Commerce relied upon the financial statements of two Indian companies, Sharp Ferro Alloys, Ltd. and SovaIspat Alloys (Mega Projects), Ltd.  For the final results Commerce relied upon the same surrogate companies plus two additional surrogate companies that Globe placed upon the record following the preliminary results – VBC and FACOR Alloy Limited ("FACOR"). Although Respondents claimed that Commerce should not rely upon FACOR because it was a "sick" company under Indian law, Commerce found otherwise.  See Decision Memorandum at 38-29.

Respondents challenge Commerce's use of FACOR's financial statement in its calculation of Respondents' surrogate financial ratios. Respondents contend that FACOR was designated as a "sick" company under the Indian Sick Industrial Companies Act ("SICA") during the POR.

In NME proceedings Commerce includes an amount for "general expenses and profit" in its determination of normal value.  19 U.S.C. § 1677b(c)(1)(B).  Pursuant to its regulations, Commerce relies upon financial statements from surrogate producers of "identical or comparable merchandise" to determine surrogate values for manufacturing overhead, general expenses, and profit ("surrogate financial ratios").  19 C.F.R. § 351.408(c)(4).  Because the statute and regulations do not specify how to calculate this component of normal value, Commerce has developed methodologies in its administrative practice.  Commerce first examines the surrogate financial statements

and classifies the surrogate companies' line-item expenses and income as they relate to the following categories: SG&A; materials, labor, and energy; factory overhead; and profit. Lightweight Thermal Paper from China, 73 Fed. Reg. 57,329 (Dep't of Commerce Oct. 2, 2008) (final results of admin. review), and accompanying Issues and Decision Memorandum at cmt. 3, available at http://www.ia.ita.doc.gov/frn/summary/PRC/E8-23284-1.pdf (last visited June 21, 2011). Commerce then excludes expenses that are accounted for elsewhere in the normal value calculation, such as movement expenses. Id. Lastly, based upon its classification of the surrogate companies' expenses, Commerce calculates surrogate financial ratios for overhead, SG&A, and profit that it includes in the normal value calculation. See generally Hebei Metals, 29 CIT at 303, 366 F. Supp. 2d at 1277 n.7.

Additionally, when Commerce relies upon Indian surrogate companies, its practice is to disregard financial statements that plainly state that the surrogate company is "sick" under SICA. See, e.g., Color Televisions from China, 69 Fed. Reg. 20,594 (Dep't of Commerce Apr. 16, 2004) (final results of admin. review), and accompanying Issues and Decision Memorandum at cmt. 14 available at http://www.ia.ita.doc.gov/frn/summary/prc/04-8694-1.pdf (last visited June 21, 2011). Commerce has previously explained that SICA was designed for companies whose accumulated losses surpass the net equity of share capital. Such companies must refer themselves to the Indian Board for Industrial and Financial Reconstruction ("BIFR") within 60 days of finalizing their audited financial statements, which triggers a judicial process that brings companies under the oversight of the BIFR. See Hot-Rolled Steel

from India, 69 Fed. Reg. 907, 913-14 (Dep't of Commerce Jan. 7, 2004) (prelim. results of admin. review).

Commerce relied upon the financial statements of four Indian companies, including FACOR, in calculating the surrogate financial ratios.  Commerce explained that the financial statements constituted the "best available information" on the record because they were "contemporaneous with the POR, publicly-available, and specific to ferro-alloy producers in India." Decision Memorandum at 36-37.

In response to Respondents' arguments that FACOR was a "sick" company under SICA and, therefore, unsuitable as a surrogate company, Commerce found that FACOR's financial statement did not plainly state that the company was sick during the POR.  Id. 38-39.  As Commerce explained, in prior cases in which it has rejected sick companies, the auditor's notes accompanying the financial statements classified the companies as sick.  Id. (citing Color Televisions from China, 69 Fed. Reg. 20,594 (Dep't of Commerce Apr. 16, 2004) (final results of admin. review), and accompanying Issues and Decision Memorandum at cmt. 14, available at http://www.ia.ita.doc.gov/frn/summary/prc/04-8694-1.pdf (last visited June 21, 2011); Steel Threaded Rod from China, 74 Fed. Reg. 8,907 (Dep't of Commerce Feb. 27, 2009) (final results of admin. review), and accompanying Issues and Decision Memorandum at cmt. 1 available at http://www.ia.ita.doc.gov/frn/summary/PRC/E9-4248-1.pdf (last visited June 21, 2011).  FACOR's financial statements did not have a corresponding auditor's note indicating the company as sick.

Respondents challenge Commerce's factual determination that FACOR was not

sick during the POR.   According to Respondents, substantial evidence demonstrates

that FACOR was sick, and therefore Commerce's reliance upon FACOR as a surrogate

company was inconsistent with Commerce's administrative practice.   <u>See</u> Def.-Ints.'

Mem. in Supp. of Mot. for J. upon the Agency R. at 6-8, ECF No. 30 ("Respondents'

Br."). The court is not persuaded by Respondents' arguments.

Respondents point to three brief passages in FACOR's financial statement that

they argue indicate FACOR was sick during the POR.   <u>See id</u>. at 6-7.  Respondents do

not, however, point to any direct statement in FACOR's financial statement that the

company was sick during the POR.   As Commerce explained, Commerce will not use

an Indian surrogate company when the financial statement provides a plain statement

that the company was sick.   <u>See</u> <u>Decision Memorandum</u> at 38.   For example, in

<u>Tapered Roller Bearings from China</u>, Commerce rejected a potential surrogate

company because the auditor's notes accompanying the financial statements stated

that the company was sick.   <u>Tapered Roller Bearings from China</u>, 64 Fed. Reg. 61,837

(Dep't of Commerce Nov. 15, 1999) (final results of admin. review), and accompanying

Issues       and       Decision       Memorandum,       <u>available       at</u>

http://www.ia.ita.doc.gov/frn/1999/9911frn/99-b15h.txt (last visited June 21, 2011)

Although it may have been possible for Commerce draw an inference regarding

FACOR's status by piecing together various passages in FACOR's financial statement,

that possibility does not undermine the reasonableness of Commerce's determination.

With respect to the single reference to a "Rehabilitation Scheme" in FACOR's financial

statement cited by Respondents, Commerce reasonably explained that, while Section

18 of SICA provides that sick companies may be required to prepare a scheme for financial reconstruction, "there is no record evidence to demonstrate that the Rehabilitation Scheme referenced by FACOR was, in fact, instituted based on the company's designation as a sick company under Indian law." Decision Memorandum at 39 (citing Respondents' Submission of Factual Info. to Rebut Globe's Surrogate Value Submission (Aug. 10, 2009) ("Respondents' Aug. 10 Submission") (Section 18 of SICA, concerning "Rehabilitation Schemes")).  Additionally, Commerce reasonably found that, even if FACOR had been previously designated as a sick company during an earlier period, FACOR was not a sick company during the POR.  Commerce explained that Section 17(2) of SICA provides "time to the company as it may deem fit to make its net worth exceed the accumulated losses," and cited the fact that FACOR was profitable in 2007 and 2008.  Id. at 39 (citing Respondents' Aug. 10 Submission) (Section 17 of SICA, concerning "Powers of Board to Make Suitable Order on the Completion of Inquiry"); Final Surrogate Memo., PD 186 at frm. 141 (FACOR's financial statement) (Jan. 5, 2010).

Respondents insist that Section 17 of SICA dictates that FACOR's implementation of a "Rehabilitation Scheme" must mean that the company remains sick, and that FACOR's multi-year profits are irrelevant because sick companies can be profitable.  See Respondents' Br. at 7-8.  At bottom, however, Respondents' argument is simply that another interpretation of the SICA is possible, and the possibility of drawing two inconsistent conclusions from the record does not mean that Commerce's conclusion is unsupported by substantial evidence.  Consolo, 383 U.S. at 620.

This is the fundamental problem with Respondents' argument.   Commerce's approach, requiring a plain statement within the financial statements that a company is operating under SICA, has the benefit of certainty and predictability.  Respondents want the court to disrupt that practice, adopt Respondents' interpretation of SICA, and order Commerce to find that FACOR was "sick".  The court's ability to direct Commerce in the manner Respondents desire requires a command of SICA (a technical, foreign statutory scheme), which in turn depends upon the administrative record and how well Respondents developed it.  All the record contains on this issue are the pertinent SICA provisions (no commentary, treatises, decisions), FACOR's financial statements, and competing interpretations of the meaning of those statutes offered by Respondents' U.S.-based counsel, and Commerce, which has dealt with the statute in multiple instances when selecting surrogate data.  Respondents did not put on the record the opinion of an expert familiar with the Indian Sick Industrial Companies Act, such as an Indian lawyer or accountant.

Commerce did not disqualify FACOR as a "sick" company because it could not identify a plain statement that the company was so designated in its financial statements.  That determination was consistent with Commerce's practice, and reasonably supported by the administrative record.  Accordingly, the court sustains Commerce's decision not to disqualify FACOR.

### E. FACOR: Expense Ratio Calculation

Respondents argue that Commerce disregarded its administrative practice by excluding the following line-items in FACOR's financial statements from the SG&A

expense ratio calculation: (1) the sale of a surplus captive power plant (a fixed asset) and (2) miscellaneous income. Respondents claim that Commerce should have incorporated these revenues into its SG&A expense ratio calculation, which, in turn, would have produced a ratio with a zero or negative value, which, ultimately, violates Commerce's administrative practice of only relying on financial statements in NME cases that report an SG&A ratio greater than zero.

Defendant contends that Respondents "did not present their alternative argument about FACOR's line-items during the administrative briefing. . . . wait[ing] until after the final results and then submit[ing] this argument among several alleged 'ministerial errors.'" Def. Resp. Br. at 31.  Defendant rejected this challenge as one to Commerce's substantive surrogate value calculation rather than a ministerial error.   Defendant argues that Respondents failed to challenge Commerce's SG&A expense ratio calculation at the appropriate stage of the administrative process and therefore failed to exhaust their administrative remedies.

Problematically for Defendant, however, the issue of Commerce's treatment of FACOR's expense ratios first manifested itself in the <u>Final Results</u>.  It was <u>after</u> the <u>Preliminary Results</u> that FACOR's financial statements first appeared on the administrative record, and the debate in the case briefs was whether those financial statements should be used at all.  Respondents ultimately lost that issue.  Importantly, it was only after Commerce issued the <u>Final Results</u> that Respondents had the opportunity to review the specific methodology Commerce applied to calculate FACORS's SG&A expense ratio.

Defendant's reliance on <u>Dorbest Ltd. v. United States</u>, 604 F.3d 1363, 1375 (Fed. Cir. 2010) is misplaced given the distinction between the facts presented here, where Commerce did not apply its ratio methodology to FACOR's financial statements in the <u>Preliminary Results</u>, and in <u>Dorbest</u>, where Commerce did apply its ratio methodology to the surrogate's financial statements in the preliminary determination. <u>See</u> <u>Dorbest Ltd. v. United States</u>, Court No. 05-00003, Pub. Admin. R., ECF No. 46  (Preliminary Determination Factors Valuation Mem. (June 17, 2004)).  The <u>Dorbest</u> respondent had the opportunity to review and challenge Commerce's ratio calculation before issuance of the final results. Here, Respondents did not have that same opportunity and application of the exhaustion doctrine would not be appropriate.

With that said, the court must remand this issue to Commerce to address Respondents' arguments in the first instance.  Defendant seems to concede that this is the proper approach.  Def.'s Br. at 34 n.3.  The court expresses no view as to the merits of Respondents' claims.

### III. Conclusion

For the reasons stated, the court sustains Defendant's determinations as to (1) a Chinese export tax and a value added tax, (2) Respondents' coal input, (3) Respondents' sales database, and (4) FACOR and the Indian Sick Industrial Companies Act, and remands the issue of FACOR's SG&A expense ratio calculation. Accordingly, it is hereby

**ORDERED** that Commerce's determinations other than FACOR's SG&A expense ratio calculation are sustained; it is further

**ORDERED** that the issue of FACOR's expense ratio calculation is remanded to Commerce for further consideration; it is further

**ORDERED** that Commerce shall file its remand results with the court on or before August 17, 2011; and it is further

**ORDERED** that the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than 14 days after Commerce files those results with the court.

/s/ Judge Leo M. Gordon<br>
Judge Leo M. Gordon

Dated: June 21, 2011
      New York, New York